## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| BARBARA WOLFSON, Derivatively on Behalf of RIVIAN AUTOMOTIVE, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT J. SCARINGE, KAREN BOONE, SANFORD SCHWARTZ, ROSE MARCARIO, PETER KRAWIEC, JAY FLATLEY, and PAMELA THOMAS-GRAHAM, <br><br> Defendants, <br><br> and <br><br> RIVIAN AUTOMOTIVE, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY DEMAND** |

Plaintiff Barbara Wolfson, by her undersigned attorneys, respectfully submits this Verified Stockholder Derivative Complaint. Plaintiff makes these allegations upon personal knowledge with respect to Plaintiff and, as to all other matters, upon information and belief developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, filings by Rivian Automotive, Inc. ("Rivian" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other information regarding Rivian. Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.      This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Rivian against the members of its Board of Directors (the "Board" or the "Individual

Defendants") for their breaches of fiduciary duty and violations of the federal securities laws, which resulted in material damage to the Company and irreparably harmed its reputation.

2.     Rivian is an electric vehicle automaker and automotive technology company that designs, develops, and manufactures electric vehicles and accessories and sells them directly to consumers and the commercial market.

3.     In 2018, the Company revealed its flagship electric vehicles, the R1T and R1S, a pick-up truck and sports utility vehicle, respectively, and began accepting preorders with a refundable deposit.  In 2019, Rivian tried to gain an edge on its competitors by lowering its vehicle pricing and promising delivery on many preorders by June 2021, beating the deadline set by the Company's competitor, Tesla, Inc. ("Tesla"), for delivery of its comparable vehicles.

4.     On November 10, 2021, Rivian launched its initial public offering of shares (the "IPO").  In the offering materials and other statements to investors, the Company touted its competitive advantages, including in pricing, and represented that it was expanding production to adequately meet demand for its vehicles.

5.     In an analyst conference call regarding the Company's third quarter financial results, Rivian's Chief Executive Officer ("CEO") Robert J. Scaringe ("Scaringe") represented that the Company was largely on track to meet demand despite some slowing of production due to "short-term" supply chain issues.

6.     On March 1, 2022, the prior representations about pricing, supply, and delivery were given the lie when Rivian announced an unexpected drastic hike in prices, marking up the prices of its vehicles by between 17-20%, blaming supply chain issues and inflation.  Customers who placed pre-orders for Rivian vehicles were furious and hundreds canceled their preorders.

Rivian's stock dropped precipitously in reaction to these disclosures; falling more than 13% in one day.

7.     Two days later, Scaringe, in a letter to customers, admitted that the Company made a mistake in its pricing strategy and rolled back the price increase for all standing preorders while keeping the price increase in place for future orders.

8.     On March 10, 2022, the Company reported disappointing financial numbers for the fourth quarter, estimating it would produce vehicles at only half-capacity in 2022 and failing to meet projected revenue for the quarter.

9.     In the wake of the pricing fiasco and Rivian's dropping stock price, securities class action lawsuits were filed by aggrieved investors against the Company, the Individual Defendants, several of the Company's officers, and the underwriters of Rivian's IPO.  As such, the Company is now subject to substantial liability and will be forced to expend substantial sums to defend itself, its officers, and directors.

10.     The Individual Defendants ignored red flags regarding Rivian's statements on pricing, delivery, and supply.  Indeed, their highly experienced Vice President of Sales and Marketing, Laura Schwab, a veteran of Aston Martin and other vehicle manufacturers, warned that the Company could not satisfy those representations without sustaining a substantial loss.  Ms. Schwab's concerns, however, were entirely ignored.  In fact, Ms. Schwab was subjected to a campaign of discrimination that left her excluded from important meetings and unable to perform her critical role at the Company after she voiced her concerns.  Ultimately, Schwab was terminated, costing her substantial amounts of equity she otherwise would have received and leading her to commence a gender discrimination action against the Company.

11.     The Individual Defendants owed and owe Rivian and its stockholders the highest fiduciary duties.  However, the Individual Defendants failed to fulfill these duties.

12.     As a result of the Individual Defendants' breaches of fiduciary duty, Rivian has sustained substantial damages and irreparable injury to its reputation.  Through this action, Plaintiff seeks to recover for the Company its damages and remediate the control weaknesses that plague Rivian.

13.     Plaintiff did not make a demand prior to bringing this action because it would be futile.  The Company's directors are neither disinterested nor independent.  In the absence of this action, Rivian will neither recover its damages nor properly remediate the weaknesses in its internal controls and corporate governance practices and procedures.

## II.     JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78t(a) and 78t-1(a).

15.     This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a).

16.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contact with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1931(b), where the Company is incorporated and where it conducts substantial business.

## III.    PARTIES

### A.    Plaintiff

19.     Plaintiff Barbara Wolfson purchased Rivian stock in the Company's IPO and has held Rivian stock continuously since that time.  As such, Plaintiff was a shareholder at the time of the transactions complained of herein.

### B.    Defendants

#### 1.    Nominal Defendant Rivian Automotive, Inc.

20.     Defendant Rivian is a company duly incorporated under the laws of the State of Delaware with headquarters at 14600 Myford Road, Irvine, California.  Rivian's common stock trades on the Nasdaq Stock Market under the symbol "RIVN."

#### 2.    Individual Defendants

##### a.    Defendant Scaringe

21.     Defendant Scaringe is the founder of Rivian.  He is CEO and a Rivian director since 2009.  Scaringe has served as Chairman of the Board since 2018.  On April 27, 2022, the Company filed a Proxy Statement with the SEC (the "2022 Proxy Statement"). According to the 2022 Proxy Statement, Scaringe beneficially owns 11,995,467  shares of Rivian Class A stock and 7,825,000 shares of Class B stock, giving him 9.2% of the Company's voting control.  According to the 2022 Proxy Statement, Defendant Scaringe received the following compensation in 2021:

| YEAR | SALARY | OPTION AWARDS | OTHER COMPENSATION | TOTAL |
|------|--------|---------------|--------------------|-------|
| 2021 | $650,000 | $421,364,482 | $126,197 | $422,140,679 |

### b.   Defendant Boone

22.     Defendant Karen Boone ("Boone") is a Rivian director since 2020, Chair of the Audit Committee, and a member of the Compensation Committee.  Boone is also on the board of Peloton Interactive, Inc. ("Peloton").  According to the 2022 Proxy Statement, Boone beneficially owns 170,353 Rivian Class A shares.  Boone received $203,658 in compensation in the form of fees and stock and option awards for her service as a director in 2021.

### c.   Defendant Schwartz

23.     Defendant Sanford Schwartz ("Schwartz") is a Rivian director since 2019, Chair of the Compensation Committee, and a member of the Plant and Policy Committee. According to the 2022 Proxy Statement, Schwartz beneficially owns 126,258 Rivian Class A shares.   Schwartz received $738,814 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Schwartz has served in several positions at Cox Enterprises, Inc, ("Cox"), a communications and automotive company, including most recently as CEO of the Cox Family Office since January 2021, guiding family investments and estate planning for the company's shareholders. Cox, through its affiliate Manheim Investments, Inc. ("Manheim"), is one of the largest shareholders of Rivian.

### d.   Defendant Marcario

24.     Defendant Rose Marcario ("Marcario") is a Rivian director since 2021 and Chair of the Plant and Policy Committee.  According to the 2022 Proxy Statement, Marcario beneficially owns 64,701 Rivian Class A shares.  Marcario received $600,185 in compensation in the form of fees and stock and option awards for her service as a director in 2021.

### e.    Defendant Krawiec

25.    Defendant Peter Krawiec ("Krawiec") is a Rivian director since 2019.  According to the 2022 Proxy Statement, Krawiec beneficially owns 38,186 Rivian Class A shares.  Krawiec received $1,180,709 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Since 2007, Krawiec has served in various leadership roles at Amazon.com., Inc. ("Amazon"), a multi-national technology company focused on e-commerce, cloud computing, digital streaming, and artificial intelligence, including as Vice President of Worldwide Corporate and Business Development since March 2021.  Amazon is the largest shareholder of Rivian.

### f.    Defendant Flatley

26.    Defendant Jay Flatley ("Flatley") is a Rivian director since 2021 and a member of the Audit Committee and the Nominating and Governance Committee.  According to the 2022 Proxy Statement, Flatley beneficially owns 72,616 Rivian Class A shares.  Flatley received $731,187 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  Flatley is the CEO and Chair of the Board of Zymergen Inc. ("Zymergen"), a biotechnology company.

### g.    Defendant Thomas-Graham

27.    Defendant Pamela Thomas-Graham ("Thomas-Graham") is a Rivian director since 2021.  Thomas-Graham is Chair of the Nominating and Governance Committee and a member of the Audit Committee.  According to the 2022 Proxy Statement, Thomas-Graham beneficially owns 20,713 Rivian Class A shares.  Thomas-Graham received $995,296 in compensation in the form of fees and stock and option awards for her service as a director in 2021.  Thomas-Graham is also on the board of Peloton.

## IV.    THE INDIVIDUAL DEFENDANTS' DUTIES

28.    By reason of their positions as officers or directors of Rivian and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Rivian and its shareholders, fiduciary obligations of loyalty, good faith, due care, and candor, and were and are required to use their utmost ability to control, manage, and oversee Rivian in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of Rivian and its shareholders to benefit all shareholders equally and not in furtherance of their own personal interests or benefit.

29.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Rivian, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

30.    As senior executive officers and directors of a publicly traded company whose common stock was registered with the SEC and traded on NASDAQ, the Individual Defendants also owed a duty to ensure the dissemination of accurate, complete, and truthful information concerning Rivian's financial condition, operations, products, internal controls, and business prospects.   In addition, the Individual Defendants had a duty to cause the Company to disclose in its regulatory filings with the SEC all material facts so that the market price of the Company's shares would be based upon accurate information.   In order to meet these duties, the Individual Defendants were required to exercise reasonable control and supervision over Rivian's management, policies, and internal controls.

31.    At all times relevant hereto, the Individual Defendants were the agents of each other and Rivian and were always acting within the course and scope of such agency.

32.     The Individual Defendants were and are also subject to particularized duties pursuant to specific policies in effect at Rivian.

**A.      Additional Duties Under The Corporate Governance Guidelines**

33.     Rivian's Corporate Governance Guidelines require that its directors, *inter alia*:

- Exercise their business judgment in good faith;

- Act in the best interest of all stockholders;

- Become and remain well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

- Ensure that the business of the Company is conducted to further the long-term interests of its stockholders.[1]

**B.      Additional Duties Under The Code Of Business Conduct**

34.     Rivian's Code of Business Conduct and Ethics ("Code of Conduct") applies to "all directors, officers, leaders, and employees."[2]

35.     The Code of Conduct emphasizes the Company's commitment to ethical business practices:

> It is core to who we are as a company to conduct business ethically and in compliance with the law. This is the right thing to do, builds trust with our customers and helps us avoid situations that might lead to adverse legal consequences or damage to our hard-earned reputation. This Code . . . sets forth the expectations for how we do business. It's what we stand for and what we expect from ourselves, each other, and those with whom we do business.

---

[1]     Rivian Automotive, Inc., Corporate Governance Guidelines, https://rivian.com/investors-governance (last visited April 18, 2022).

[2]     Rivian Code of Business Conduct and Ethics, https://rivian.com/investors/governance (last visited April 18, 2022).

36. The Code of Conduct urges employees to speak up about violations of the Code of Conduct:

> Let us know if you witness or experience any potential violations of our Code. When you speak up, you're helping everyone at Rivian. You have an obligation to raise a concern if you hear or see anything unusual or questionable. Reach out via our Rivian Ethics Hotline at 1-844-986-1441 or through our dedicated website at www.rivian.ethicspoint.com.

37. The Code of Conduct stresses the need to maintain accurate records:

> Accurate recordkeeping and reporting are necessary to meet accounting, legal and regulatory requirements. Maintaining financial integrity is essential and reflects positively on our reputation and credibility. As a public company, Rivian is subject to various securities laws, regulations, and reporting obligations. Both U.S. federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations, and inaccurate, incomplete or untimely reporting can severely damage the Company and result in legal liability. Each of us—at every level—has a responsibility for ensuring the accuracy of all Company business and financial records.
>
> From quality assurance records, budget forecasts, and regulatory filings, to emails, timesheets, benefit claim forms, and expense reports, we all handle Company records. Be sure to follow all internal processes, record retention requirements, policies, and generally accepted accounting principles so that our records accurately reflect all transactions. Be honest, accurate, timely, and complete in everything you record.

38. The Code of Conduct highlights the importance of building transparent customer relationships:

> Our suppliers, customers, and other business partners place a great deal of trust in our brand, and we are determined to never let them down. We see them as true partners, and they are essential to Rivian's continued growth and success. Building relationships with suppliers, customers, and other business partners is an ongoing process and requires an enduring commitment to high standards of business conduct. In every interaction we have with these third parties, we must demonstrate honesty and a commitment to our values*. **Just one deceptive or dishonest act can seriously damage a relationship.[3]***

\*\*\*

---

[3]   All emphasis herein is added unless otherwise stated.

*Everything we tell our customers, suppliers, and other business partners must be truthful*, including our advertising and other communications.  Do not engage in any unfair, deceptive, or misleading practices.

\*\*\*

Deal honestly and fairly with our customers.  Be truthful about Rivian and what we sell.  *Do not make any claims the Company cannot support or substantiate*.

## C.     Additional Duties Of The Members Of The Audit Committee

39.     The members of the Company's Audit Committee have additional duties outlined

in the Audit Committee Charter, including requirements that its members:

- Review with management the Corporation's major financial risk and enterprise exposures and the steps management has taken to mitigate such exposures, including the structure, design, adoption, and implementation of the Corporation's risk management policies and internal control systems.

- Review the scope of the internal and independent auditors' assessment of internal control over financial reporting and obtain reports on any significant deficiencies and/or material weaknesses, together with recommendations and management's responses.

- Coordinate the Board of Directors' oversight of the Corporation's Code of Business Conduct and Ethics and monitor the procedures in place to enforce the Code.

## D.     Additional Duties Of The Members Of The Nominating And Governance Committee

40.     The members of the Company's Nominating and Governance Committee have

additional duties outlined in the Nominating and Governance Committee Charter, including

requirements that its members:

- Develop and recommend to the Board of Directors a set of corporate governance guidelines applicable to the Corporation, review such guidelines from time to time as the Nominating and Governance Committee deems appropriate, and recommend any necessary or appropriate changes to the Board of Directors.

- Oversee the Corporation's corporate governance practices and procedures, including identification of best practices, review, and recommendation to the Board of Directors for approval of any changes to the documents, policies, and procedures in the

Corporation's corporate governance framework, including its certificate of incorporation and by-laws.

**E.    Additional Duties Relating To The Prevention Of Discrimination**

41.    The Company's Code of Conduct stresses that "[f]ollowing local, state and federal laws is fundamental to how we do business at Rivian.…  Laws touch all aspects of our business at Rivian, from how we make, market, promote, and sell our vehicles, *to how we treat one another.* Each one of us is individually accountable for respecting and following the laws everywhere where we operate."

42.    In a section entitled "We Collaborate Respectfully," the Code of Conduct emphasizes every Rivian director, officer, and employee's obligation to promote a non-discriminatory culture:

> We do not tolerate discrimination or harassment in any form, including any conduct or comments that create, encourage, or permit an offensive or intimidating work environment. This includes verbal or physical harassment; racism; sexism; bullying; sexual harassment; retaliation; inappropriate humor; mistreatment of others based upon their personal characteristics, beliefs, or membership in a protected class, or other actions that offend or cause distress.  Everyone at Rivian is entitled to work in an environment that is free of harassment, bullying, discrimination, and retaliation.

> Promote fairness, diversity, and inclusion.  Each person is a key player on our team, deserving of respect.  Demonstrate that you appreciate others' varied backgrounds, skills, and cultures.  Never single anyone out for negative treatment and be fair in all employment decisions.  Base your decisions on factors like skills, qualifications, performance, and business needs—never on personal characteristics, national origin, ethnicity, military status, or religious beliefs.

> ***

> If you see, experience, or suspect harassment or discrimination, speak up about it. You can speak directly to the person or through your manager.  Your People Partners or the Legal Team are also available to provide guidance. You may also make a report using the Rivian Ethics Hotline.

43.     The Code of Conduct warns that "[i]t is not enough for managers and supervisors to just understand and adhere to the Code.  You also have an obligation to inspire others to act with integrity and serve as a resource for employees with questions or concerns."

44.     Title VII of the Civil Rights Act of 1964 ("Title VII") is a federal law that prohibits discrimination in employment on the basis of sex, race, color, national origin, and religion, and it applies to employers, like Rivian, with 15 or more employees.  Title VII also makes it illegal to retaliate against a person who complains about discrimination, filed a charge of discrimination, or participated in an employment discrimination investigation or lawsuit.  Likewise, employment discrimination is prohibited in jurisdictions around the country where Rivian operates its businesses, where the alleged conduct took place, and where Rivian is incorporated.  *See* Del. Code Ann. tit. 19, § 711A (2019).

45.     The Individual Defendants' fiduciary duties require them to monitor the Company's compliance, reputational, and ethics risks.  These risks include acts that may violate Title VII, state anti-discrimination, anti-retaliation laws, and the Company's Code of Conduct. The Company's fiduciaries have a duty to act promptly when presented with credible evidence of misconduct occurring within the Company's executive ranks: they must address leaders' wrongdoing; guard employees from retaliation and further abuse; and protect the Company's public image.  The Individual Defendants, based on their fiduciary duties, must avoid violating anti-discrimination and anti-retaliation laws through their actions on behalf of the Company.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    Background

46.    Rivian was founded by Defendant Scaringe in 2009.[4]  Modeled as a competitor to Tesla, the Company's goal is to develop revolutionary emissions-free electric vehicles.  Rivian has backing from, among others, Amazon and Ford Motor Corporation, amounting to more than $10 billion.[5]

47.    In 2018, Rivian debuted its flagship vehicles, the R1T and R1S, an upscale pickup truck and sport utility vehicle, respectively, designed to be driven off-road.[6]  In the press release disclosing the details of the launch, the Company laid out a production timeline and discussed base pricing:

> R1T pricing starts at $61,500 after Federal Tax credit. R1S pricing starts at $65,000 after Federal Tax credit.[7]  Deliveries begin in late 2020.  Fully equipped vehicles with the highest performance level and largest battery pack will enter production first.  The 180 kWh pack (400+ miles range) and 135 kWh pack will be available at launch, with the base variant (250+ miles range) to follow within 12 months of the start of production.  Rivian is now accepting preorders for a refundable deposit of $1,000.

---

[4]    The Company was originally named Avera Motors.  The Company's name was changed to Rivian Automotive, Inc. in 2011.  John McCarthy, *Rivian Automotive, Founded by a Brevard Native, Goes Public. It's Now Worth $100 Billion, Florida Today,* Nov. 10, 2021, https://www.floridatoday.com/story/tech/science/space/2021/11/10/rivian-automotive-founded-rockledge-now-worth-100-billion/6377151001/.

[5]    Peter Eavis, *et al*., Rivian, an Electric Vehicle Start-Up, Reveals Large Losses in Its I.P.O. Filing, *The New York Times*, Nov. 10, 2021, https://www.nytimes.com/2021/10/01-business/rivian-ipo.html.

[6]    Rivian Press Release, Rivian Launches World's First Electric Adventure Vehicle, Nov. 27, 2018,        https://rivian.com/newsroom/article/rivian-launches-worlds-first-electric-adventure-vehicles.

[7]    This amounted to $69,000 for a base model of the R1T and $72,000 for a base model of the R1S before any incentives.

48.     In December 2019, Tesla, Rivian's chief competitor, revealed its base model Cybertruck would cost $39,900, well below Rivian's offerings.  Rivian quickly countered and lowered the price of its base model R1T to $67,500 before any incentives.[8]  Rivian also set a delivery date for the R1T for June 2021, beating Tesla's timeline.[9]

49.     On October 1, 2021, Rivian filed a Registration Statement with the SEC for its IPO (the "IPO Registration Statement"), which was signed by all the Individual Defendants. On November 12, 2021, Rivian filed a Prospectus for the IPO (the "IPO Prospectus") with the SEC, which was signed by all the Individual Defendants.[10]  In the IPO, the Company sold approximately 153,000,000 shares of common stock at a price of $78.00 per share.  Rivian received proceeds of approximately $12 billion from the IPO, after deducting underwriting discounts and commissions, and expenses.

50.     In the IPO Registration Statement, the Company revealed an anticipated 2023 delivery date of preordered R1T and R1S vehicles:

> As of October 31, 2021, we had approximately 55,400 R1T and R1S preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000.  Based on our current production forecast, we expect to fill our preorder backlog of approximately 55,400 R1 vehicles by the end of 2023.

---

[8]     Ian Osborne, *Rivian Releases Prices of Its New R1T Electric Pick-up Range, Electric Drivers,* Nov. 12, 2020, https://www.electricdrives.tv/post/rivian-releases-prices-of-its-new-r1t-electric-pick-up-range.

[9]     *Id.*

[10]     The IPO Prospectus and the IPO Registration Statement are collectively referred to herein as the "IPO Materials."

**B.      The Individual Defendants Knew The**
**Material Risks Regarding Rivian's Core Operations**

51.     In the IPO Materials, the Individual Defendants detailed the risks relating to

Rivian's reliance on preordering:

> ***Preorders for our vehicles are cancellable and fully refundable***
>
> Deliveries of the R1T began in September of 2021 and deliveries of the R1S are not expected to begin until December 2021 and may occur later or not at all.  As a result, we offer waitlist preorders for consumers with a cancellable and fully refundable deposit of $1,000.  Deposits paid to preorder the R1T and R1S are cancellable by the customer until the customer enters into a lease or purchase agreement.  Because all of our preorders are cancellable, it is possible that a significant number of customers who submitted preorders for our vehicles may not purchase vehicles.
>
> The potentially long wait from the time a preorder is made until the time the vehicle is delivered, and any delays beyond expected wait times, could also impact consumer decisions on whether to ultimately make a purchase.  Any cancellations could harm our business, prospects, financial condition, results of operations, and cash flows.  (Emphasis in original).

52.     In the IPO Materials, the materiality of pricing to Rivian's success was highlighted:

"we believe the primary competitive factors in our markets are talent and culture, technological

innovation, product performance and quality, customer experience, brand differentiation, product

design, ***pricing*** and TCO, and manufacturing scale and efficiency."

53.     The IPO Materials demonstrate that the Individual Defendants were aware of the

risk to Rivian's business posed by supply chain issues and semiconductor chip shortages:

> We are dependent on our existing suppliers, a significant number of which are single or limited source suppliers and are also dependent on our ability to source suppliers, for our critical components, and to complete the building out of our supply chain, while effectively managing the risks due to such relationships.
>
> ***
>
> ***We depend upon third parties to manufacture and to supply key semiconductor chip components necessary for our vehicles.  We do not have long-term agreements with all of our semiconductor chip manufacturers and suppliers, and***

*if these manufacturers or suppliers become unwilling or unable to provide an adequate supply of semiconductor chips, with respect to which there is a global shortage, we would not be able to find alternative sources in a timely manner and our business would be adversely impacted.*

Semiconductor chips are a vital input component to the electrical architecture of our consumer and commercial vehicles, controlling wide aspects of the vehicles' operations.  Many of the key semiconductor chips used in our vehicles come from limited or single sources of supply, and therefore a disruption with any one manufacturer or supplier in our supply chain would have an adverse effect on our ability to effectively manufacture and timely deliver our vehicles.  Due to our reliance on these semiconductor chips, we are subject to the risk of shortages and long lead times in their supply.  We are still in the process of identifying alternative manufacturers for semiconductor chips. We have in the past experienced, and may in the future experience, semiconductor chip shortages, and the availability and cost of these components would be difficult to predict. For example, our manufacturers may experience temporary or permanent disruptions in their manufacturing operations due to equipment breakdowns, labor strikes or shortages, natural disasters, component or material shortages, cost increases, acquisitions, insolvency, changes in legal or regulatory requirements, or other similar problems. [Emphasis in original].

\*\*\*

*We may experience significant delays in the design, manufacture, financing, regulatory approval, launch and delivery of our vehicles, which could harm our business, prospects, financial condition, results of operations, and cash flows.*
Our future business depends in large part on our ability to execute on our plans to develop, manufacture, market and sell our vehicles.  Our initial deliveries for the R1T and R1S were and are, respectively, delayed, and our production ramp is taking longer than originally expected due to a number of reasons.  Although we have not experienced any material increase in cancellations of customer pre-orders to date, any further delay in the financing, design, manufacture, regulatory approval, launch or delivery of our vehicles could materially damage our brand, business, prospects, financial condition, results of operations, and cash flows, and could cause liquidity constraints.  (Emphasis in original).

\*\*\*

Furthermore, we have no experience to date in high volume manufacturing of our vehicles and we cannot assure that we will be able to develop efficient, automated, low-cost manufacturing capabilities and processes, and reliable sources of component supply, that will enable us to meet the quality, price, engineering, design and production standards, as well as the production volumes, required to successfully market our vehicles as our operations expand.   Any failure to

17

effectively manage our growth could materially and adversely affect our business, prospects, financial condition, results of operations, and cash flows.

54.     The Individual Defendants also disclosed the potential that legal proceedings relating to its pricing may have a material impact on Rivian, its financial condition, and business prospects:

> Currently, we are involved in, or may in the future be involved in, legal proceedings, claims or government investigations in the ordinary course of business relating to, among other things . . . false or misleading advertising, regulatory matters, competition, **_pricing_** . . . and securities.

***

> [T]here is always the risk that a proceeding, claim or investigation will have a material impact on our business, results of operations or financial condition. Regardless of the final outcome, litigation can have an adverse impact on us due to defense and settlement costs, diversion of management resources, harm to our reputation and brand and other factors.

55.     The IPO Materials disclosed a material weakness in the Company's internal controls over financial reporting:

> **_We have identified material weaknesses in our internal control over financial reporting. If our remediation of such material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to develop and maintain effective internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired._**  (Emphasis in original).

***

> The material weaknesses identified pertained to controls to address segregation of duties across financially relevant functions and information technology general controls over tools and applications used in financial reporting. We have concluded that these material weaknesses existed because, as a private company, we did not have the necessary business processes, systems, personnel and related internal controls necessary to satisfy the accounting and financial reporting requirements of a public company.

***

> Additionally, as stated above, we have not performed an evaluation of our internal control over financial reporting as permitted under the JOBS Act; accordingly, we

18

cannot assure you that we have identified all, or that we will not in the future have additional, material weaknesses.  Material weaknesses may still exist when we report on the effectiveness of our internal control over financial reporting as required under Section 404 of the Sarbanes-Oxley Act, beginning with our second annual report after the completion of this offering.

***

If during the evaluation and testing process we identify additional material weaknesses in our internal control over financial reporting or determine that existing material weaknesses have not been remediated, ***our management will be unable to assert that our internal control over financial reporting is effective.*** Even if our management concludes that our internal control over financial reporting is effective, our independent registered public accounting firm may conclude that there are material weaknesses with respect to our internal control over financial reporting.  If we are unable to assert that our internal control over financial reporting is effective, or when required in the future, if our independent registered public accounting firm is unable to express an unqualified opinion as to the effectiveness of our internal control over financial reporting, investors may lose confidence in the accuracy and completeness of our financial reports, the market price of our Class A common stock could be adversely affected and we could become subject to litigation or investigations by the stock exchange on which our securities are listed, the SEC, or other regulatory authorities, which could require additional financial and management resources.

56.     In a Quarterly Report on Form 10-Q filed with the SEC on December 17, 2021 (the "3Q21 10-Q"), the Company again disclosed the risks related to obtaining sufficient supply to manufacture Rivian vehicles[11]:

Our ability to manufacture vehicles and develop future solutions is dependent on the continued supply of input materials, including metals, battery cells, and semiconductors.  Fluctuations in the cost of materials, supply interruptions, or material shortages could materially impact our business.  For example, the recent global semiconductor supply shortage is having wide-ranging effects across the automotive industry and has impacted our operations and financial performance, along with those of many automotive suppliers and manufacturers that incorporate semiconductors into their products.  We have experienced and may continue to

---

[11]     The 3Q21 10-Q was signed by Defendant Scaringe and pursuant to the Sarbanes-Oxley Act of 2002, he certified that the 3Q21 10-Q fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the 3Q21 10-Q fairly presented, in all material respects, the financial condition and results of operations of the Company.

experience cost fluctuations or disruptions in the supply of input materials that could impact our financial performance.

\*\*\*

Our success will be dependent upon our ability to enter into supplier agreements and maintain our relationships with existing suppliers who are critical and necessary to the output and production of our vehicles.  The supply agreements we have, and may enter into with suppliers in the future, may have provisions where such agreements can be terminated in various circumstances, including potentially without cause.  If our suppliers become unable to provide, or experience delays in providing, components, or if the supply agreements we have in place are terminated, it may be difficult to find replacement components.  Additionally, our products contain thousands of parts that we purchase from hundreds of mostly single- or limited-source suppliers, for which no immediate or readily available alternative supplier exists.

\*\*\*

If we do not enter into long-term supply agreements with guaranteed pricing for our parts or components, we may be exposed to fluctuations in the prices of components, materials, and equipment. Agreements for the purchase of battery cells contain or are likely to contain pricing provisions that are subject to adjustments based on changes in market prices of key commodities. Substantial increases in the prices for such components, materials, and equipment would increase our operating costs and could reduce our margins if we cannot recoup the increased costs.  ***Any attempts to increase the announced or expected prices of our vehicles in response to increased costs could be viewed negatively by our potential customers and could adversely affect our business, prospects, financial condition, results of operations, and cash flows.***

\*\*\*

As the scale of our vehicle production increases, we will also need to accurately forecast, purchase, warehouse, and transport components at high volumes to our manufacturing facility.  If we are unable to accurately match the timing and quantities of component purchases to our actual needs or successfully implement automation, inventory management, and other systems to accommodate the increased complexity in our supply chain and parts management, we may incur unexpected production disruption, storage, transportation, and write-off costs, which may harm our business, prospects, financial condition, results of operations, and cash flows.

57.    In the 3Q21 10-Q, the Company discussed the risks relating to attracting and

retaining customers:

**The success of our business depends on attracting and retaining a large number of customers.  If we are unable to do so, we will not be able to achieve profitability.**

Our success depends on attracting a large number of potential customers to purchase our vehicles and the associated services we will provide to our customers.  As of December 15, 2021, we had accepted preorders for approximately 71,000 R1 vehicles in the United States and Canada.  Preorders are not commitments to purchase our R1T or R1S and are subject to cancellation by customers.  If our existing preorder and prospective customers do not perceive our vehicles and services to be of sufficiently high value and quality, cost-competitive and appealing in aesthetics or performance, we may not be able to retain our current preorder customers or attract new customers, and our business, prospects, financial condition, results of operations, and cash flows would suffer as a result.  In addition, we may incur significantly higher and more sustained advertising and promotional expenditures than we have previously incurred to attract customers.  Further, our future success will also depend in part on securing additional commercial agreements with businesses and/or fleet operators for our commercial vehicles.  To date, we have limited experience selling our EVs and we may not be successful in attracting and retaining a large number of consumer and commercial customers.  If for any of these reasons, we are not able to attract and maintain consumer and commercial customers, our business, prospects, financial condition, results of operations, and cash flows would be materially harmed.

58.    In the 3Q21 10-Q, the Company disclosed that it had not remedied the material weakness in internal controls and that "if during the evaluation and testing process we identify additional material weaknesses in our internal control over financial reporting or determine that existing material weaknesses have not been remediated, our management will be unable to assert that our internal control over financial reporting is effective."

### C.    Rivian And The Individual Defendants' Representations Regarding Rivian's Competitive Strengths And Expansion To Meet Demand

59.    In the IPO Materials, Rivian and the Individual Defendants boasted of the Company's production capabilities and expansion to meet demand:

Our manufacturing facility in Normal, Illinois (the "Normal Factory") ***is currently equipped to produce up to 150,000 vehicles annually*** (distributed between the R1 platform, which will be used to produce the R1T and R1S, and the RCV platform, which will be used to produce EDVs and other commercial vehicles), when the equipment is operated at full rate and on multiple shifts.  The current annual

installed capacity for the R1 platform and RCV platform is approximately 65,000 and 85,000 vehicles, respectively. . . .  Our target is to produce approximately 1,310 R1 vehicles a week, which when annualized (assuming 49.6 working weeks per year), equates to the current installed R1 platform capacity of approximately 65,000 R1 vehicles annually . . . . ***We expect our vehicle production rate will improve as we continue to increase the speed of the line, hire and train employees to run additional shifts, commence production of the R1S and EDVs, and increase the rate of purchased materials from our supply chain.  We expect to reach a vehicle production rate, which, when annualized, would result in us using 100% of the facility's current installed capacity of up to 150,000 vehicles by late 2023.***

60.   In the IPO Materials, Rivian and the Individual Defendants touted the Company's competitive advantages, including customer loyalty as evidenced by a substantial number of preorders for its vehicles:

> Our diverse product portfolio and focus on inspiring people to get out and explore the world position us to build an enduring brand while addressing a wide range of future mobility and sustainability solutions.  Through our base of preorders, we observe strong affinity for our brand which we expect to intensify as brand awareness grows and we welcome new customers to the Rivian community.…  We believe the combination of our deep focus on addressing climate change, building compelling products, and delivering a superior customer experience will enable Rivian to drive adoption and customer loyalty, powering our continued growth.

61.   In the IPO Materials, Rivian and the Individual Defendants attributed the Company's growth to tailoring its vehicles for customer satisfaction and building  direct customer relationships:

> **The Rivian Advantage**
>
> We designed all aspects of our ecosystem, business model, offerings, and organization to enable a scalable, customer-centric, and efficient approach resulting in key competitive advantages.
>
> ***
>
> ***Direct Customer Relationships***.  Our direct relationships with customers allow us to gather insights, design solutions that best serve their needs, drive strong engagement, remove structural inefficiencies, create transparency, and increase customer satisfaction and referrals.  By controlling every customer touchpoint from awareness through ownership, we replace a patchwork of third parties with Rivian's end-to-end, integrated solutions.

62.     Rivian and the Individual Defendants described the Company's commitment to providing customers with an "exceptional experience" based on "intuitive digital tools and ***robust infrastructure***."

63.     In the IPO Materials, Rivian and the Individual Defendants detailed several key factors to deliver a superior customer experience including awareness, engagement, and conversion:

***Awareness***

We generate awareness without sacrificing authenticity.  The Rivian brand keeps an honest, approachable, transparent tone and is designed around adventure.

\*\*\*

***Engagement***

Every consumer interaction comes directly from Rivian; whether it is attending an event, subscribing to our digital content, or purchasing one of our vehicles.…  By designing our experiences entirely around our consumers we seek to create connection and trust, and a compelling case to move to the next step in the journey with us.

\*\*\*

***Conversion***

We have made buying a Rivian vehicle simple, transparent, and easy.  There are no dealers to visit or complex, high-pressure sales tactics to endure.  We have removed the uncomfortable haggling and unfair leverage typically encountered in the traditional dealership model.  Our intuitive online ordering process replaces what otherwise requires several hours at a dealership, with a stress-free experience you can manage in minutes from your couch.  Should an issue arise, every consumer has a dedicated Rivian Guide they can call, text, or email directly for help.  If a consumer isn't satisfied, we offer the assurance of a hassle-free 7-Day, 1,000-Mile Return Policy.  Removing barriers to purchase with helpful, proactive, frictionless shopping tools and customer service results in more willingness to try our brand, including our vehicles, accessories, services, and merchandise.

64.     In the IPO Materials, Rivian and the Individual Defendants discussed the Company's long-term growth strategy stressing that a key growth component was an "increase[d] share in existing markets" through "offer[ing] additional vehicle variants across a broader set of price points *supported by scale-driven supply chain efficiencies*, further vertical integration, and technology advancements."

65.     In the 3Q21 10-Q, the Company updated stockholders on its production progress and further expansion efforts to meet demand:

> In the consumer market, we launched the R1 platform with our first generation of consumer vehicles, the R1T, a two-row five-passenger pickup truck, and the R1S, a three-row seven-passenger sport utility vehicle ("SUV").  As of September 30, 2021, we produced 12 R1Ts and delivered 11 R1Ts, and as of December 15, 2021, we have produced 652 and delivered 386 R1 vehicles, including the production and sale of our first two, recently certified, R1S vehicles.  As of December 15, 2021, we had approximately 71,000 R1 preorders in the United States and Canada from customers who each paid a cancellable and fully refundable deposit of $1,000.

> \*\*\*

> We intend to expand our operations significantly, which will require hiring, retaining and training new personnel, controlling expenses, establishing facilities and experience centers, and implementing administrative infrastructure, systems, and processes.  For example, we currently plan to expand our manufacturing and supply chain operations into international markets, and we are planning to build a second manufacturing plant in Georgia beginning in the summer of 2022.

66.     On December 17, 2021, in a conference call with financial analysts regarding Rivian's reported third-quarter financial results, Defendant Scaringe represented that the Company was ramping up production and that any supply-chain issues would be short-term:

> As of yesterday, we have produced 652 R1 vehicles and delivered 386 of these, including a production sale of our first two recently certified R1S vehicles earlier this week.  With 13 working days left at our normal facility, our dedicated teams are working as hard as possible to get as many customers or vehicles by year-end.  For 2021, we expect to produce a few hundred vehicles short of our initial 1,200 vehicle production target.

> \*\*\*

*Our production ramp of the R1T, R1S, EDV 700 and EDV 500 will continue into next year.  And we remain confident in our long-term manufacturing trajectory.* Just as we are scaling our manufacturing facility, hundreds of our suppliers are also scaling their production to match our vehicle ramp rate.  Our procurement team has remained nimble and continues to work with our supplier partners across all tiers to mitigate issues stemming from our supply chain, the labor market, and the COVID pandemic.  Given the uncertainty within the supply chain, we've decided to carry higher inventory levels than previously assumed to help ensure we consistently have parts to build.

*The good news is we do not believe any of our supply chain challenges represent long-term systemic issues.  While our product development and manufacturing teams have been focused on ramping our normal production facility, our real estate and facilities team have been working diligently to ensure we remain well-positioned to capture and drive the accelerated large-scale adoption of sustainable transportation.*

67.    Scaringe represented that despite the growing volume of preorders, Rivian would satisfy customer demand:

> With the growing backlog of 71,000 preorders and our 100,000 unit order from Amazon, we are excited to begin to satisfy the tremendous demand for our products and services.  Our team has rallied around their shared values and continue to demonstrate a tireless work ethic as we continue scaling our production volumes.

68.    Claire McDonough ("McDonough"), Rivian's Chief Financial Officer ("CFO"), also spoke on the analyst conference call, describing supply chain issues as temporary and representing that the Company was working to build up its "inventory balance to help mitigate the supply chain challenges we have experienced today."

69.    McDonough also claimed that despite a "negative gross profit of $82 million" for the third quarter, the loss made sense for the near term, based on "operating and running our large scale, highly vertically integrated plants, amortized over a small but growing number of vehicles."

70.    In the question-answer portion of the call, Scaringe reiterated that Rivian was poised to meet the "short-term" supply chain challenges:

We've been very focused on making sure we not only are effectively ramping what's in our plant, but also effectively ramping across all of our suppliers.

Now with that said, those challenges have been really a focal point for us over the last two and a half, three months.  And as you heard, we don't see any long-term systemic challenges associated with ramping the supply chain.  ***A number of these issues are short-term in nature, and they are solvable problems.***

\*\*\*

[W]hile this has been a constraint to this point, we do not see this as a long-term constraint, given that we've added so much capacity over the last couple of months.

71.     When a Wolf Research analyst questioned Scaringe about the effect of inflation on vehicle pricing, Scaringe admitted that Rivian vehicles were "aggressively priced," and said an adjustment in pricing was something we've certainly considered and talked about quite a bit."

### D.     Rivian Falls Short On Production And Raises Its Vehicle Prices

72.     On January 10, 2022, Rivian announced it had only produced 1,015 vehicles in 2021 and delivered a mere 920 vehicles.[12]

73.     On March 1, 2022, Rivian announced that it was raising the prices on the R1T pickup and R1S SUV by 17 percent and 20 percent, respectively, and that the new prices would apply to nearly all preorders.[13]  The base price for an R1T was raised from $67,500 to $79,500 and the R1S jumped from close to $70,000 to $84,000.[14]

---

[12]     Rivian Press Release, Jan. 10, 2022, https://rivian.com/newsroom/article/rivian-closed-2021-with-over-1000-vehicles-produced.

[13]     Edward Ludlow, Rivian Raises Prices of Electric Vehicles, Citing Higher Costs for Part, *Bloomberg*, March 1, 2022, https://www.bloomberg.com/news/articles/2022-03-01/rivian-raises-prices-of-electric-vehicles-on-higher-parts-costs.

[14]     *Id.*

74.     In an emailed statement,[15] Rivian's Chief Growth Officer Jiten Behl ("Behl") blamed inflation, supply chain issues, and component price increases:

> Like most manufacturers, Rivian is being confronted with inflationary pressure, increasing component costs, and unprecedented supply chain shortages and delays for parts (including semiconductor chips).

> \*\*\*

> This rise in cost and complexity due to these challenging circumstances necessitate an increase to the prices of the R1T and R1S models we offer today—prices which were originally set in 2018.

75.     An emailed statement to customers who pre-ordered Rivian vehicles[16] informed them that they would be forced to pay $6,000 more for a larger battery pack,[17] that the car would only be available in a seven-seat configuration, and that the Company was charging higher prices for the vehicles they pre-ordered:

> Vehicle base pricing and the cost of certain options, upgrades, and accessories have increased. All packages of the R1S will now only be offered in a 7-seat configuration. We're in the process of updating your Rivian Account page to reflect these adjustments and we will send you an email notification when the update is complete.

> \*\*\*

> To that end, today we're also announcing the introduction of Rivian Dual-Motor AWD for both R1T and R1S. Dual-Motor AWD features one motor for each axle for exceptional power and control. The system is designed to excel both off-road and on-road, going from 0-60 mph in as few as 4.0 seconds while still delivering all-wheel traction. Deliveries are planned to begin in 2024. We are also introducing our 260+ mile range Standard battery pack, with deliveries planned to begin in 2024.

---

[15]     Fred Lambert, Rivian Announces 2 Motor and Smaller Battery Options, Config Updates, and Steep $12,000+ Price Increase, *Electrek*, March 1, 2022, https://electrek.co/2022/03/01/rivian-prices-increases-many-electric-pickup/.

[16]     Jcor, Post #1, https://www.rivianownersforum.com/threads/new-email-just-received-important-r1s-pricing-and-product-information.2418/#post-22915 (last visited March 23, 2022).

[17]     Rivian introduced another motor option (dual-motor), but the quad-motor option, which only works with the larger $6,000 battery pack, is the only one currently in production.

76.     An article[18] published on *Electrek*, a news website dedicated to electric transportation and sustainable energy, explained, customers were left with the choice of "either accept[ing] a significantly lower spec vehicle that won't arrive until 2024 at the earliest or pay[ing] much much more for the reservation you already made. Neither choice sounds great."

77.     The *Electrek* article also pointed out that "Rivian is likely finding out that its gross margin targets are going to be hard to achieve without higher prices," causing the Company to increase prices dramatically, which demonstrated a lack of internal controls.[19]   A follow-up *Electrek* article noted that many frustrated reservation holders pointed out that if the price increases were based on inflation and increased material costs, "the price increases would have been smaller and more gradual."[20]

78.     The customer response to the price increases and production and delivery delays was swift and furious.  Customers canceled their preorders in droves.[21]   A poll at the time, showed that of 3,200 respondents, 1,700 were canceling their orders immediately and another 1,100 were "still deciding" if they should cancel.[22]   As one R1S preorder customer pointed out:

> *A [$]17[,000] increase is not inflation - it means it wasn't priced appropriately to begin with.*  Add in the new 'option' for a dual motor which is positioned as a great

---

[18]     Fred Lambert, *Rivian Announces 2 Motor and Smaller Battery Options, Config Updates, and Steep $12,000+ Price Increase*.

[19]     *Id.*

[20]     Fred Lambert, *Rivian Buyers are Canceling at Alarming Rates after Price Increases, Electrek*, March 2, 2022, https://electrek.co/2022/03/02/rivian-buyers-canceling-alarming-rate-after-price-increases/.

[21]     *See* https://www.rivianownersforum.com/threads/new-email-just-received-important-r1s-pricing-and-product-information.2418/#post-22915 (last visited April 18, 2022).

[22]     Fred Lambert, *Rivian Buyers are Canceling at Alarming Rates after Price Increases.*

new option but in reality it just means they are now charging you more for the quad motor which was previously the only option.  This feels like a gigantic bait and switch.[23]

79.     Following the news of customer defections, Rivian's stock price fell $8.35 per share, or more than 13%, from $61.91 per share on March 1, 2022, to close at $53.56 per share on March 2, 2022.

80.     On March 3, 2022, Defendant Scaringe, in an open letter to customers,[24] walked back the price hikes for preorders made before March 1, 2022, and admitted the Company's pricing strategy was flawed at its inception:

> Earlier this week, we announced pricing increases that broke the trust we have worked to build with you.
>
> ***
>
> As we worked to update pricing to reflect these cost increases, we wrongly decided to make these changes apply to all future deliveries, including pre-existing configured preorders.  ***We failed to appreciate how you viewed your configuration as price locked, and we wrongly assumed the announced Dual-Motor and Standard battery pack would provide configurations that would deliver price points similar to your original configuration***.  ***While this was the logic, it was wrong, and we broke your trust in Rivian.***
>
> We also didn't manage communications well.  We didn't give you enough insight into what was driving these decisions.  The most important aspect of what we are building is our relationship with all of you.  As we demonstrated earlier this week, trust is hard to build and easy to break.  In speaking with many of you over the last two days, I fully realize and acknowledge how upset many of you felt. I have made a lot of mistakes since starting Rivian more than 12 years ago, but this one has been the most painful.… We made a mistake in how we approached our pricing changes[.]

---

[23]     Damorris25, Post #12, https://www.rivianownersforum.com/threads/new-email-just-received-important-r1s-pricing-and-product-information.2418/#post-22915 (last visited April 18, 2022).

[24]     *Businesswire, A Letter from Rivian CEO RJ Scaringe on Pricing Updates,* March 3, 2022, https://www.businesswire.com/news/home/20220303005717/en/A-Letter-from-Rivian-CEO-RJ-Scaringe-on-Pricing-Updates.

*** 

*For anyone with a Rivian preorder as of the March 1 pricing announcement, your original configured price will be honored.  If you canceled your preorder on or after March 1 and would like to reinstate it, we will restore your original configuration, pricing and delivery timing.*  (Emphasis in original).

81.    An RBC Capital Markets analyst[25] predicted that the pricing roll-back would cost the Company around $850 million in revenue and that the higher prices going forward would make it harder for Rivian to attract new customers, noting that "the thesis had been that Rivian could sell whatever it could make, but there may now be some more holes in that."[26]

82.    Following the pricing roll-back, Rivian shares fell an additional $2.65 per share, or approximately 5%, from $53.56 per share on March 2, 2022, to close at $50.91 per share on March 3, 2022.

83.    In a letter to shareholders attached to a Current Report on Form 8-K filed with the SEC on March 10, 2022, the Company disclosed disappointing financial numbers for the fourth quarter.  For example, the Company reported revenue of $54 million despite earlier projected revenue of $64 million, with a negative gross profit of $383 million.  The Company announced it expected to produce only 25,000 vehicles in 2022, despite having the capacity to build 50,000 vehicles with its current facilities, citing "supply chain constraints."[27]  GAAP net loss for the fourth

---

[25]    Ed Ludlow, *Rivian Hits Record Low After Admitting 'Mistake' on Price Hikes*, *Bloomberg*, March 3, 2022, https://www.bloomberg.com/news/articles/2022-03-03/rivian-cancels-price-hikes-for-existing-customers-after-outcry.

[26]    *Id.*

[27]    Analysts were hoping for 40,000 vehicles from Rivian in 2022.  *See* Dani Romero, *Rivian since IPO is 'A Bad Episode out of the Twilight Zone': Wedbush's Dan Ives, Yahoo News,* March 12, 2022, https://news.yahoo.com/rivian-since-ipo-dan-ives-144129461.html.

quarter was $2.45 billion, or $4.83 per share, compared to a loss of $353 million, or $3.50 per share for the same period a year earlier.

84.     A Wedbush Securities analyst described Rivian's downward spiral since its IPO:

> Since its IPO in late 2021 the Rivian story has been a bad episode out of The Twilight Zone for the Street. The company missed their first quarter out of the box on supply chain issues 'surprises,' then instituted a 20% price unit increase due to inflationary pressures which were then taken back 48 hours later by management after a slew of customer cancellations, and last night added to the pain with very soft unit guidance for 2022. **To say the Rivian story has been disappointing to us (and the Street) so far would be an understatement. [T]hey need to start delivery models to customers and stop the excuses.**[28]

85.     Following the release of the fourth-quarter numbers, Rivian's stock fell another 7.5%, from $41.16 per share on March 10, 2022, to close at $38.05 per share on March 11, 2022.

86.     In a March 18 report, Bloomberg analysts reported on the "uphill climb" Rivian faced due to its recently disclosed production and supply issues:

> Rivian's uphill climb as a nascent, no-scale automaker in a low-margin business is steepening, facing rising commodity prices and supply chain snarls, while unable to leverage established relationships to secure critical parts and materials. Guidance for a 25,000-unit production target for 2022 -- less than a third of 83,000 pre-orders -- suggests a delay of more than a year for some buyers, a wait time that could prompt some to bail.  Fiscal 2022 revenue could approach $2 billion yet is unaffected by an early March price increase of at least 17% that will only apply to new placed orders.

87.     On March 31, 2022, the Company filed its Annual Report on Form 10-K with the SEC for the period ended December 31, 2021 (the "2021 10-K").[29]

---

[28]     *Id.*

[29]     The 2021 10-K was signed by all of the Individual Defendants.  Defendant Scaringe executed a certification pursuant to SOX that the report fully complied with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of the Company.

88.     The 2021 10-K confirmed that Rivian continued to suffer from a material weakness

in its internal controls:

> **We have identified material weaknesses in our internal control over financial reporting.  If our remediation of such material weaknesses is not effective, or if we experience additional material weaknesses in the future or otherwise fail to develop and maintain effective internal control over financial reporting, our ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired** [emphasis in original].

***

> The material weaknesses previously identified pertained to controls to address segregation of duties across financially relevant functions and IT general controls over our Enterprise Resource Planning systems, applications, and tools used in financial reporting.  We have concluded that these material weaknesses continue to exist as of December 31, 2021.

***

> We will not be able to fully remediate these material weaknesses until these steps have been completed and have been operating effectively for a sufficient period of time.  Additionally, we cannot assure you that we have identified all, or that we will not in the future have additional, material weaknesses.  Material weaknesses may still exist when we report on the effectiveness of our internal control over financial reporting as required under Section 404 of the Sarbanes-Oxley Act, beginning with our second annual report after the completion of our IPO.

**E.     Rivian Is Sued In Securities Class Action Lawsuits**

89.     In the wake of the spiraling stock price caused by Rivian's disclosures regarding

pricing, delivery, and supply, securities class action lawsuits were filed against Rivian and certain

of its directors and officers.  On March 7, 2022, *Crews  v. Rivian Automotive, Inc., et al.*, No. 2:22-

cv-01524-RGK-E (C.D. Cal.), was filed seeking damages on behalf of a class of persons who

purchased or otherwise acquired Rivian shares pursuant  or  traceable  to  the  Company's  IPO.

Crews charged the Company, the Individual Defendants, the underwriters of the Company's IPO,

and several of the Company's officers with violations of Section 11 of the Securities Act of 1933

("Securities  Act").    Crews  alleges  that  the  Company's  IPO  Registration  Statement  made

representations that were materially inaccurate, misleading, and/or incomplete because they failed to disclose, among other things, that (1) the R1T and R1S were underpriced to such a degree that Rivian would have to its raise prices shortly after the IPO; (2) these price increases would tarnish Rivian's reputation; and (3) would put a significant number of preorders in danger of cancellation, leading to an inflation of the Company's stock at the time of the IPO.  When the truth was revealed, Rivian's stock price spiraled downward causing the putative class to suffer substantial damages.

90.     On March 22, 2022, *Horvath v. Rivian Automotive, Inc., et al.*, No. 8:22-cv-00444-RGK-E (C.D. Cal.), was filed.  Horvath seeks damages on behalf of a class of persons who purchased or otherwise acquired Rivian shares between November 10, 2021, and March 10, 2022, inclusive, and all persons and entities who purchased Rivian common stock pursuant and/or traceable to the Registration Statement in conjunction with the Company's IPO.  Horvath charges the Company, the Individual Defendants, and several of the Company's officers with violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, as well as Sections 11 and 15 of the Securities Act.  Horvath alleges that the named defendants made false and/or misleading statements and/or failed to disclose that: (1) Rivian would not meet its 2021 production and delivery targets; (2) Rivian's vehicles were underpriced, and the Company would need to substantially increase prices; and (3) as a result, the defendants' representations about the Company's business, operations, and prospects lacked a reasonable basis.  When the truth was revealed, Rivian's stock price spiraled downward causing the putative class to suffer substantial damages.

91.     On April 19, 2022, *Smith v. Rivian Automotive, Inc., et al.*, No. 8:22-cv-00829-DOC-DFM (C.D. Cal.), was filed.  Smith seeks damages on behalf of a class of persons who purchased or otherwise acquired Rivian shares between November 10, 2021, and March 10, 2022,

inclusive, and all persons and entities who purchased Rivian common stock pursuant and/or traceable to the Registration Statement in conjunction with the Company's IPO. Smith charges the Company, the Individual Defendants, and several of the Company's officers with violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, as well as Sections 11 and 15 of the Securities Act. Smith alleges that the named defendants made false and/or misleading statements and/or failed to disclose that: (1) Rivian would not meet its 2021 production and delivery targets; (2) Rivian's vehicles were underpriced, and the Company would need to substantially increase prices; and (3) as a result, the defendants' representations about the Company's business, operations, and prospects lacked a reasonable basis. When the truth was revealed, Rivian's stock price spiraled downward causing the putative class to suffer substantial damages.

### F.    Rivian Is Sued For Gender Discrimination

####     1.    Schwab, a highly qualified auto executive leaves a lucrative position to join Rivian's environmentally conscious culture

92.    On November 4, 2021, Laura Schwab ("Schwab"), the former Vice President of Sales and Marketing at Rivian, filed a lawsuit[30] against the Company, alleging that she was terminated in retaliation for complaining about Rivian's discriminatory "toxic bro culture." Schwab also filed a claim with the American Arbitration Association.  the recently filed suit, Schwab published an article in *Medium,* an online publishing platform, describing the culture at Rivian as one that "marginalizes women and contributes to the company making mistakes."[31]  In

---

[30]    *Schwab v. Rivian Automotive, et al.*, No. 30-2021-01229809-CU-OE-CJC, (Cal. Sup. Ct.), ECF No. 2 ("Schwab Complaint").

[31]    Laura Schwab, *Medium*, https://medium.com/@lauraschwab1/life-outside-the-boys-club-why-i-spoke-up-about-rivians-toxic-bro-culture-and-got-fired-15600b999ae7.

an interview with *The Wall Street Journal,*[32]  Schwab called the culture at Rivian "the worst I've experienced in over 20 years in the automotive industry."

93.      Schwab was a highly qualified auto executive with over two decades of experience before joining Rivian.  Schwab started at an entry-level job at Jaguar Land Rover and worked her way quickly up the ranks, serving for fifteen years in executive and management positions, including as Director of Marketing for the UK.  Later, Schwab became the first female President in Aston Martin Lagonda's ("Aston Martin") 105-year history, leading its North American division for five years.[33]

94.      In her role as President in the North American division at Aston Martin, Schwab grew the Americas region from one of the company's worst performing to one of the best performing globally while overseeing the launch of six new vehicles, recruiting key brand ambassadors, and running the distribution network throughout the Americas, Mexico, and Canada.[34]  Schwab was a frequent speaker at automotive conferences and events and received numerous awards for her leadership and work as a woman executive in a largely male-led industry.[35]

95.      Schwab began working as Rivian's Vice President of Sales and Marketing on November 30, 2020.  Through her interviews with Jiten Behl, the Chief Growth Officer at Rivian,

---

[32]      Ben Foldy, *et al.*, *Ex-Rivian Executive's Discrimination Suit Airs Questions About Business Plans as IPO Looms, The Wall Street Journal,* Nov. 4, 2021, https://www.wsj.com-articles-ex-rivian-executive-sues-for-gender-discrimination-ahead-of-ipo-11636054512.

[33]      Schwab Compl. at ¶ 14.

[34]      *Id.*

[35]      *Id.* at ¶ 15.

Schwab picked up on the lack of operational automotive experience at Rivian.  Schwab confirmed this understanding through discussions with other Rivian employees.[36]

96.     As head of Sales and Marketing, Schwab was responsible for marketing, business-to-business sales, remarketing (*i.e.*, the ability to price and sell trade-ins, as well as sell Rivian used vehicles), sales planning and operations, accessory sales, merchandise sales, retail experience, test drives, customer engagement centers, Rivian insurance, and a dotted line to Rivian financial services.[37]  Schwab's role required the creation of an organization virtually from scratch to produce Rivian's promised 1,000 vehicles in a very short time frame.[38]

97.     Despite her significant role at the Company, Schwab learned she would be compensated below market rates and her own expectations.  Schwab put aside her misgivings about the lack of operational automotive experience at the Company and the starting salary, relishing the opportunity to build a brand from the ground up and work at a company that emphasized a culture focused on "preserving the planet."[39]

### 2.     Schwab is excluded from "Rivian's toxic bro culture"

98.     Schwab quickly learned that Rivian's corporate culture centralized all real decision-making to the clique of men surrounding Defendant Scaringe.  According to Schwab: "Defendant Scaringe was clearly and literally in the driver's seat, and he surrounded himself with a tight-knit

---

[36]     *Id.* at ¶ 16.

[37]     *Id.* at ¶¶ 18–19.

[38]     *Id.* at ¶ 17.

[39]     Laura Schwab, *Medium*, https://medium.com/@lauraschwab1/life-outside-the-boys-club-why-i-spoke-up-about-rivians-toxic-bro-culture-and-got-fired-15600b999ae7.

group of men who constantly had his ear.  Many of these men had worked together before or hired one another and had created their own 'boys' club.'"[40]

99.     At first, Schwab met with Defendant Scaringe regularly.  The check-ins, however, became less frequent because Scaringe only met with new hires and the "OG"–Scaringe's all-male inner circle.[41]

100.    Schwab's first feedback meeting with Behl went well and Behl praised her ability to work well with challenging or difficult employees and said that Schwab's performance was "very good."[42]

101.    Despite her excellent job performance and integral role, Schwab was left out of important meetings and cut out of the decision-making process at the Company.  Schwab was kept in the dark about Company initiatives and expectations, which hindered her ability to get her job done, denying the Company the full benefit of her vast operational experience and skill.

102.    Despite being excluded, Schwab performed her duties skillfully, reflecting her substantial experience in the industry.  In less than a year, she launched the Company's test drive tour, led the successful opening of the Company's first "brand experience hub" in Venice, California, and developed a new merchandise collection, complete with in-house fulfillment through Rivian Parts Development Centers.[43]  Schwab grew the marketing team, created new content, and built up the Customer Relationship Management team.  Along with her team, Schwab

---

[40]     *Id; see also* Schwab Compl. at ¶¶ 27-31.

[41]     *Id.* at ¶ 22.

[42]     *Id*. at ¶ 23.

[43]     *Id.* at ¶¶ 24–26.

renegotiated a remarketing contract, saving the Company more than a million dollars, along with many other noteworthy accomplishments.

103.    Schwab consistently raised concerns about Rivian's underpriced vehicles and unrealistic manufacturing deadlines, as well as the dearth of operating experience among its staff, but no one listened, even with her "extensive experience launching and pricing vehicles."[44]  Her concerns about "***Rivian's misleading public statements and flawed business practices***" were summarily dismissed.[45]

104.    Schwab was also concerned about the refinement of Rivian's manufacturing process which could impede vehicle quality and safety.  Therefore, Schwab cautioned that the first vehicles should go to Rivian employees.  Behl dismissed her concerns, but ultimately her proposal was adopted when suggested by others.[46]

105.    Behl consistently marginalized Schwab's expertise and talents, taking away key projects from Schwab's group and freezing hiring for her marketing team while assigning those projects to groups led by Schwab's male counterparts and staffing them with fresh hires.[47]  For example, Behl initially asked Schwab to lead Project Apollo, the Company's IPO, but when Larry Parker ("Parker"), Rivian's Executive Creative Director, pushed back on this assignment, Behl removed Schwab from the project.  Schwab asked Behl to lead the pricing discussions, which was

---

[44]    Laura Schwab, *Medium*, https://medium.com/@lauraschwab1/life-outside-the-boys-club-why-i-spoke-up-about-rivians-toxic-bro-culture-and-got-fired-15600b999ae7.

[45]    Schwab Compl. at ¶ 3.

[46]    *Id.* at ¶ 29.

[47]    *Id.* at ¶¶ 36–38, 42.

a natural fit for her experience and her position, but it was assigned to a male manager who worked in consumer digital.

106.    Toward the end of September 2021, Behl messaged Schwab on Slack and told her not to hire any more marketing heads.  Schwab complied but questioned the impetus behind the decision.  Behl told her to just talk to Parker, the Executive Creative Director, as he needed more support.  Schwab reached out to Parker who informed her that he and Behl had unilaterally decided that Schwab's team was overstaffed.  Schwab was surprised because the marketing budget had already been preapproved by all team members working under Behl.  A short time later, Schwab learned that Behl had paused recruitment for the Director of Hospitality Programming role without consulting with her first.  This decision was illogical because the Company had just opened its first retail space in Venice, and it was struggling to manage events and production.[48]

107.    Between September and October 2021, Behl canceled every recurring weekly meeting scheduled with Schwab and virtually ended all communication while continuing to meet with Schwab's male counterparts.[49]

108.    On October 4, 2021, Schwab met with McDonough, Rivian's CFO, to ask "if she could join the sales projections meetings with [ ] Scaringe and [ ] Behl, to make sure the company was setting reasonable target goals and accurately tracking production."[50]  McDonough replied that she was also *excluded from the meetings*.

---

[48]      *Id.* at ¶ 37.

[49]      *Id.* at ¶ 33.

[50]      *Id.* at ¶ 34.

109.    On October 9, 2021, Marco Batra ("Batra"),  the Senior Director of Global Delivery Operations at Rivian, reached out to Behl and Schwab regarding the upcoming test drives following the New York test event.  At a July meeting, the Commercial leadership team had already agreed that Batra's team would manage the deliveries and drives of vehicles delivered to customer homes and Schwab's team would manage the strategy and execution of the actual test drives.  Schwab confirmed via email that her team was ready to handle the test drives going forward.  Behl replied abruptly, "Laura, just hand test drive to Marco!"[51]

110.    Two of Schwab's male colleagues acknowledged that the male-dominant culture excluded female talent from decision-making and caused male employees to cover up mistakes rather than correct them, and one colleague, Batra, even reached out to the Human Resources department to report the behavior.[52]

111.    On October 10, 2021, Schwab attempted to reach Behl the entire day but only reached him at night.  After addressing her in a condescending fashion, and dismissing her concerns, Behl said that he would only respond to Slack messages sent in the evening, which Schwab found both unprofessional and demeaning.[53]

112.    On October 11, 2021, Schwab contacted the Human Resources department to complain about the toxic culture at Rivian and Behl's behavior.[54]  The Human Resources officer, Farinaz Raissi ("Raissi"), admitted that Behl **refused to meet with her as well**.[55]  Raissi advised

---

[51]    *Id.* at ¶ 38.

[52]    *Id.* at ¶¶ 39, 48.

[53]    *Id.* at ¶¶ 41–44.

[54]    *Id.* at ¶¶ 45–46.

[55]    *Id.* at ¶ 46.

Schwab to write down her thoughts and share them with Behl but did not commit to investigating Behl's conduct.[56]

113.    Later that day, Batra and Schwab had a conversation in which Schwab discussed her conversation with Raissi and raised the issue of Rivian's toxic culture.  Batra concurred with Schwab's assessment of Rivian's culture and said it was also affecting a member of his team, Jessie Yoste.[57]

114.    On October 14, 2021, in response to an email from Schwab detailing steps to implement following their previous discussion, Behl asked Schwab to meet with him to discuss "organizational structure."  Schwab texted Raissi to see if she had raised Schwab's concerns with Behl but received no response.[58]

115.    On October 15, 2021, Behl called Schwab into his office and terminated her employment claiming that Rivian needed to reorganize as the Company moved into a new "operational" phase.[59]  Schwab understood that she was being terminated as the result of her complaining about discrimination.  Indeed, Behl and Raissi, who was also present at the meeting, admitted that Schwab was a "high performer" was "well respected" in the Company.  Further, Raissi admitted that she knew Schwab had discussed her concerns with other employees.[60]

---

[56]    *Id.* at ¶ 47.

[57]    *Id.* at ¶ 48.

[58]    *Id.* at ¶ 49.

[59]    *Id.* at ¶ 50.

[60]    *Id.*

Schwab alleges that the claimed restructuring was a ruse, as evidenced by the fact that no other executives were fired due to restructuring.

116.    Following her dismissal, Schwab received dozens of messages from Rivian employees expressing their shock and dismay at her termination and praising her leadership abilities.[61]

117.    Schwab's old boss at Aston Martin, Dr. Andy Palmer, defended her, saying that Schwab "is one of the most professional Sales & Marketing Execs I've had the pleasure to work with.  I've no idea why you [woul]d hire someone of this quality and then not listen to them!"[62]

118.    Schwab alleges that Rivian's discrimination and retaliation cost her millions of dollars in unvested equity.[63]

### G.    The Individual Defendants Ignored Red Flags

119.    Rivian suffered from a "dearth of operational automotive experience."[64]  The Company's highly experienced V.P. of Sales and Marketing consistently raised operational issues with management during her time at the Company, but the Individual Defendants neither investigated nor took action in response to her concerns.  Schwab first learned about the lack of operational expertise at Rivian during her interview process and from speaking with other Rivian

---

[61]    *Id.* at ¶ 55.

[62]    Jonathan M. Gitlin, *"Toxic Bro Culture": Former Rivian executive Speaks Out, Sues Company, Ars Technia*, Nov. 5, 2021, https://arstechnica.com/cars/2021/11/toxic-bro-culture-former-rivian-executive-speaks-out-sues-company/.

[63]    Schwab Compl. at  ¶¶ 52, 56.

[64]    *Id.* at ¶ 16.

employees.  "[B]eginning in spring of 2021, Ms. Schwab started to raise the alarm about Rivian's ability to deliver on its promises to investors."[65]  However, her concerns were dismissed.

120.  Schwab warned management that Rivian's vehicles were underpriced and that "each sale would result in a loss [to] the company":

> Schwab ultimately contacted Dennis Lucey, Rivian's Finance Director, and worked with him to develop projections showing how much of a loss the company would incur if Rivian did not raise prices.  Ms. Schwab raised this issue with several executives, including Mr. [Jiten] Behl, Stuart Dixon (Director of Product Management), and Andy Zicheck (Principal Product Manager).  Mr. Behl brushed her off.  Eventually, Mr. Hunt raised the issue with Mr. Behl, at which point Mr. Behl agreed that *they would need to raise the vehicle prices after the IPO.*[66]

121.  Schwab warned that "the publicly announced dates for manufacturing and delivery were not achievable."  In Sales and Operations planning meetings in September 2021, Schwab said that "the company should set a realistic objective."[67]  Schwab also cautioned that Rivian's manufacturing process was not sufficiently defined to ensure vehicle safety, integrity, and quality.[68]

122.  Schwab also raised concerns about Rivian's use of an expensive third-party vendor to execute test-drive events.  Her concerns were dismissed, which led to the events going over budget and the cancellation of subsequent events.[69]

123.  The red flags were not only presented internally by an experienced automotive executive, but also externally by experienced securities investment analysts who warned early on

---

[65]   *Id.* at ¶ 17.

[66]   *Id.* at ¶ 28.

[67]   *Id.* at ¶ 30.

[68]   *Id.* at ¶ 29.

[69]   *Id.* at ¶ 31.

that Rivian could not produce vehicles at expected rates and would have difficulty scaling in a low-margin business.  For example, New Constructs, an equity research firm, in a report on November 4, 2021, noted the substantial risks caused by delays in delivering vehicles by noting the impact production delays previously took on other vehicle manufacturers:

> We know from Tesla's early days (filled with setbacks and delays) that it takes years to develop scale and manufacturing capabilities to routinely deliver a large number of quality vehicles on time. Rivian, despite investments from Ford that could help alleviate some early growing pains, has already delayed the delivery of its flagship vehicles.  Any further delays could make some of the company's pre-ordering customers, which total ~54,000 as of October 31 for its passenger vehicles, look elsewhere. For comparison, Ford announced in October 2021 that it had over 160,000 reservations for its F-150 Lightning.

124.    In a December 16, 2021 report, Bloomberg analysts discussed Rivian's challenges of operating in a "low-margin and capital-intensive business":

> Rivian's first quarterly earnings report since a November IPO highlights the steep road that lies ahead, as it attempts to gain scale in a low-margin, capital-intensive business via the most competitive segments: pickup trucks and delivery vans.  Just 386 battery electric vehicles were delivered through Dec. 15, nearly all to employees.  The company's valuation exceeds those of Ford and GM, obscuring the fact that those established automakers will staunchly defend share in the $110 billion pickup-truck segment.  An Amazon.com order for 100,000 electric delivery vans expands the product portfolio but locks up Rivian's commercial output to one customer for as long as six years.  Rivian expects to miss its target to produce 1, 200 R1Ts and 25 R1S SUVs by year-end as manufacturing delays are worked out.

125.    In a follow-up report on February 16, 2022, New Constructs stated that Rivian stock would be at an 82% downside even if the Company produced *seven times more than industry expectations*:

> We review an additional DCF scenario to highlight the downside risk even if Rivian's revenue grows seven times faster than the expected industry growth rate, given that it is starting from essentially $0 revenue.

> ***

> RIVN is worth just $11/share today–an 82% downside. In this scenario, Rivian would generate $21.4 billion in revenue in 2030, which is equal to Tesla's 2018

revenue.  At an ASP of $38k, the average new car price in the U.S. in 2020, this scenario implies Rivian sells 560 thousand vehicles in 2030, which is 106% of the number of Chevrolet Silverado's sold in 2021 and 77% of the F-150s sold in 2021. For reference, this level of production is also nearly 3x the maximum production capacity of the company's Normal Factory.

Based on our reverse DCF model, if the company cannot achieve at least seven times the expected industry growth rate, the downside could be as much as 100%.

126.    The Individual Defendants ignored the red flags raised by Schwab's warnings that the Company was underpricing its vehicles and could not realistically meet its production goals, even when those warnings were repeated by several financial analysts.  If the Individual Defendants had taken timely action, the damage caused to Rivian could have been prevented or, at least, minimized.

**H.    Rivian's Materially False And Misleading Proxy Statement**

127.    On April 27, 2022, the Company filed its 2022 Proxy Statement with the SEC soliciting shareholder votes to, among other things, elect Defendants Scaringe, Krawiec, and Schwartz to the Board.  The 2022 Proxy Statement was issued by order of the Board and signed by Defendant Scaringe.

128.    The 2022 Proxy Statement represents that the Board oversees and monitors the Company's risk exposures:

Risk assessment and oversight are an integral part of our governance and management processes. Our Board of Directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the Board of Directors at regular Board of Directors meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board of Directors does not have a standing risk management committee, but rather administers this oversight function directly through the Board of Directors as a whole, as well as through various standing

45

committees of the Board of Directors that address risks inherent in their respective areas of oversight. While our Board of Directors is responsible for monitoring and assessing strategic risk exposure, our Audit Committee is responsible for overseeing our major financial risk and enterprise exposures and the steps our management has taken to mitigate such exposures, including the structure, design, adoption and implementation of our risk management policies and internal control systems. The Audit Committee also oversees management of cybersecurity risks and approves or disapproves any related person transactions. Our Compensation Committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. Our Nominating and Governance Committee manages risks associated with the independence of our Board of Directors and governance matters…. The Board of Directors does not believe that its role in the oversight of our risks affects the Board of Directors' leadership structure.

129.     The 2022 Proxy Statement represents that Rivian's culture is collaborative, omitting the gender discrimination faced by Schwab and other Rivian employees:

Coming together to do more than we can on our own.

Building a collaborative culture is critical for us to deliver on our mission – the complexity of our products and customer ecosystems means that a wide range of skillsets and backgrounds must work closely together to make thousands of decisions every day.

The degree to which we are successful in continuing to build and maintain our collaborative culture will directly translate to our ability to create beautifully curated and holistically integrated customer experiences. This cross-system view is also foundational for our ability to achieve our sustainability and carbon neutrality targets.

130.     The foregoing statements in the 2022 Proxy Statement were false and misleading and omitted material information.  Contrary to the representations made in the Proxy, the Board was required, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct in connection with the Company's pricing

strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

## VI.   DEMAND FUTILITY AND DERIVATIVE ALLEGATIONS

131.   Plaintiff brings this action derivatively and for the benefit of Rivian to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Rivian, gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

132.   Rivian is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

133.   Plaintiff is, and has been at all relevant times, a stockholder of Rivian and was a stockholder of the Company at the time of the transactions alleged herein.  Plaintiff will adequately and fairly represent the interests of Rivian in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

134.   Demand upon the Board to institute this action against the Individual Defendants would be futile and is, therefore, excused.  The Board is neither disinterested nor independent.

### A.   Demand Upon Defendant Scaringe Is Excused

135.   Defendant Scaringe is the founder and CEO of Rivian since its inception.  Thus, as the Company admits in its IPO Materials, he is not an independent director.

136.   The Company provides Defendant Scaringe with his principal occupation from which he receives substantial compensation, including $422,140,679 in fiscal year 2021 alone.  Thus, Scaringe could not consider a demand for action that might require him to sue the directors

that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

137.    Scaringe will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Scaringe holds 11,995,467 shares of Rivian Class A common shares and 7,825,000 shares of Rivian Class B common shares, giving him 9.2% of the Company's voting control.  If Scaringe acknowledged that he, Rivian, or others engaged in misconduct, his investment in Rivian would be substantially devalued.  Further, if Scaringe acknowledged that executives at Rivian had engaged in the wrongdoing alleged, he would be acknowledging that he, as the CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

138.    Defendant Scaringe is named as a defendant in the pending securities class action lawsuits.  As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

139.    Scaringe signed the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

140.    Scaringe is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Rivian Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

141.    Scaringe, as a director of Rivian, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding

misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

142.    Scaringe knew or should have known that Rivian's vehicle pricing and production capabilities were inadequate to meet its intended gross margins, that the Company would need to dramatically raise its vehicle prices to increase revenue, and that his and other Rivian executives' representations to the contrary were either false and misleading or omitted material information. Scaringe created a toxic discriminatory culture at Rivian, exposing the Company to liability, damaging its reputation, and leading to the departure of experienced talent.  Scaringe was required to investigate and take action to prevent damage to Rivian but failed to take timely action, ignoring all red flags pointing to deficiencies in the Company's internal controls.  Had Scaringe taken timely action, the damage caused to Rivian could have been prevented or minimized.

143.    Scaringe is neither disinterested nor independent.  Any demand upon Defendant Scaringe is futile and, thus, excused.

### B.    Demand Upon Defendant Boone Is Excused

144.    Defendant Boone will investigate or take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Boone holds 170,353 shares of Rivian Class A common shares.  Boone received $203,658 in compensation in the form of fees and stock and option awards for her service as a director in 2021.  If Boone acknowledged that she, Rivian, or others engaged in misconduct, her investment in Rivian would be substantially devalued and her lucrative position jeopardized.

145.    Defendant Boone is named as a defendant in the pending securities class actions. As such, she is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

146.    Boone authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

147.    Boone has a long-standing business relationship with Defendant Thomas-Graham which precludes them from acting in an independent and disinterested manner.  Boone has been a director on the board of Peloton alongside Defendant Thomas-Graham for more than three years.

148.    Boone, as a director of Rivian, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

149.    As Chair of the Audit Committee, Boone had duties regarding oversight of the risks facing the Company and Rivian's compliance with relevant laws, rules, and regulations.  Boone utterly failed to perform these essential duties.

150.    Boone is neither disinterested nor independent.  Any demand upon Defendant Boone is futile and, thus, excused.

**C.      Demand Upon Defendant Schwartz Is Excused**

151.    Schwartz will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Schwartz holds 126,258 shares of Rivian Class A common shares. Schwartz received $738,814 in compensation in the form of fees and stock and option awards for his service as a director in 2021. If Schwartz

acknowledged that he, Rivian, or others engaged in misconduct, his investment in Rivian would be substantially devalued and his lucrative position jeopardized.

152.    Defendant Schwartz is named as a defendant in the pending securities class actions. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

153.    Schwartz authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

154.    Schwartz is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Rivian Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

155.    Schwartz has served in several positions at Cox, a communications and automotive company, over the last thirty-seven years including most recently as CEO of the Cox Family Office since January 2021, helping to guide family investments and estate planning for the company's shareholders.   Manheim, an affiliate of Cox, owns approximately 39,262,248 Rivian Class A shares, with total voting control of 4.2%.   Cox designated Schwartz as a director of the board in 2019.  Schwartz would not investigate and take action against those responsible since it would devalue that substantial investment.

156.    Cox also entered into a Master Subscription Agreement with Rivian in November 2020 to provide products and services to support Rivian's consumer vehicle sales:

**Transactions with Manheim Investments, Inc. and its affiliates**

In November 2020, we entered into a Master Subscription Agreement, subsequently amended and restated in May 2021 as a Master Services Agreement, with Cox Automotive Corporate Services, LLC ("Cox Automotive"), an affiliate of Cox which is a holder of more than 5% of our capital stock, in respect of products and services to be offered by Cox Automotive and its affiliates in support of our consumer vehicle sales (the "Cox Automotive MSA").   Pursuant to various

statements of work and work orders under the Cox Automotive MSA, Cox Automotive or its subsidiaries will provide products and services at prices agreed upon in such work orders related to title and registration, retail financial services, data services, and trade-in vehicle remarketing via Cox Automotive brands such as Dealertrack and Manheim.

Under the terms of the Consignment Services Statement of Work under the Cox Automotive MSA, dated May 7, 2021, with Manheim Remarketing, Inc., a subsidiary of Cox Automotive (the "Consignment SOW"), we have agreed to a market share commitment of a specified percentage of trade-in vehicles meeting certain characteristics in exchange for preferential pricing on the services related to these vehicles. The Consignment SOW has an initial term of three years following our commencement of R1 vehicle deliveries. We have the right to terminate the Consignment SOW, for any reason or no reason, after 40,000 vehicle transactions under the SOW.

157. Schwartz, as a director of Rivian, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

158. Schwartz is neither disinterested nor independent. Any demand upon Defendant Schwartz is futile and, thus, excused.

**D.    Demand Upon Defendant Marcario Is Excused**

159. Defendant Marcario will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Marcario holds 64,701 shares of Rivian Class A common shares. Marcario received $600,185 in compensation in the form of fees and stock and option awards for her service as a director in 2021.

If Marcario acknowledged that she, Rivian, or others engaged in misconduct, her investment in Rivian would be substantially devalued and her lucrative position jeopardized.

160.    Defendant Marcario is named as a defendant in the pending securities class actions. As such, she is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

161.    Marcario authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

162.    Marcario, as a director of Rivian, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

163.    Marcario is neither disinterested nor independent.  Any demand upon Defendant Marcario is futile and, thus, excused.

**E.    Demand Upon Defendant Krawiec Is Excused**

164.    Krawiec will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Krawiec holds 38,186 shares of Rivian Class A common shares. Krawiec received $1,180,709 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  If Krawiec acknowledged that he, Rivian, or others engaged in misconduct, his investment in Rivian would be substantially devalued and his lucrative position jeopardized.

165.    Defendant Krawiec is named as a defendant in the pending securities class actions. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

166.    Krawiec authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

167.    Krawiec is seeking to benefit from the violation of Section 14(a) of the Exchange Act pled herein by securing his re-election to the Rivian Board through the false and misleading statements and material omissions in the 2022 Proxy Statement.

168.    Since 2007, Krawiec has served in various leadership roles at Amazon, including as Vice President of Worldwide Corporate and Business Development since March 2021.  Amazon is the largest shareholder of Rivian with beneficial ownership of approximately 159,522,782 Rivian Class A shares and total voting control of 18.1%.  According to the IPO Prospectus, Krawiec shares voting control and investment power over Amazon's shares in Rivian.  Krawiec would not investigate and take action against those responsible since it would devalue that substantial investment.

169.    Amazon also nominated Krawiec as a director per a nominating agreement outlined in the 2022 Proxy Statement:

> In October 2021, we entered into the Nomination Agreement with Amazon pursuant to which we agreed, subject to certain exceptions, to nominate and use our reasonable best efforts to cause the election to our Board of Directors for a three-year term a slate of Class I Directors that includes Peter Krawiec, or such other designee identified by Amazon in accordance with the terms of the Nomination Agreement, at the first annual meeting of our stockholders following our IPO. Notwithstanding the foregoing, the Nomination Agreement does not require any stockholder to vote in a manner that ensures the election of Amazon's director nominee.
>
> The Nomination Agreement provides that Amazon shall withdraw the designation of its nominee upon the Board of Director's reasonable determination that certain conditions are met, including (i) that the appointment of such nominee would cause

us not to be in compliance with applicable law, (ii) such nominee is prohibited from serving on the board of a public company pursuant to a relevant order, decree or judgment, (iii) such nominee is a director, officer, employee, holder of 1% or more of the equity securities, or an affiliate of a competitor the Company, and (iv) such nominee is not reasonably acceptable to a majority of the independent members of our Board of Directors (excluding Peter Krawiec or other Amazon designee serving on our Board of Directors).

The Nomination Agreement will terminate in accordance with its terms upon the earlier to occur of (i) our and Amazon's written agreement to terminate the Nomination Agreement and (ii) 11:59 p.m. Seattle time on the date of the Annual Meeting (subject to extension for any adjournments or postponements thereof).

170.    Further, in February 2019, Rivian entered into an agreement with Amazon and its affiliates to provide 100,000 vehicles for Amazon's delivery fleet.[70]  The deal is discussed at length in the IPO Prospectus and reveals how dependent Rivian is on Amazon:[71]

### EDV Agreement

In February 2019, we entered into a commercial letter agreement with Amazon and in September 2019, we entered into a related framework agreement with Logistics. Amazon is the parent company of both Logistics and NV Holdings.  We refer to these agreements, together with any work orders, purchase orders, related agreements and amendments thereunder or thereto, collectively, as the "EDV Agreement."  Under the EDV Agreement, we and Logistics have agreed to collaborate to design, develop, manufacture and supply to Logistics EDVs and/or certain component parts and related services for use in Amazon's last mile delivery operations. *We also have agreed under the EDV Agreement that until the fourth anniversary of the Initial Delivery Date, whether or not Logistics purchases any EDVs from us, we will exclusively provide last mile delivery vehicles to Logistics, and from the fourth anniversary to the sixth anniversary of the Initial Delivery Date, Logistics will have a right of first refusal to purchase any last mile delivery vehicles that we produce.*

171.    Since 2016, Rivian uses Amazon Web Services, Inc., an Amazon affiliate, for cloud computing services:

---

[70]     Edward Ludlow, *et al.*, *Amazon brought EV Delivery Van Startup Rivian Auto World Stardom—and Can Take it Away, Fortune,* Oct. 7, 2021, https://fortune.com/2021/10/07-amazon-brought-ev-delivery-van-startup-rivian-auto-world-stardom-and-can-take-it-away/.

[71]     *Id.*  The deal was first discussed in a Form S-1 filed with the SEC on October 1, 2021.

*Amazon Web Services Agreements*

In 2016, we engaged Amazon Web Services, Inc. ("AWS"), an affiliate of NV Holdings which is a holder of more than 5% of our capital stock, for the supply of various cloud computing services, including, but not limited to, servers, managed database services, managed analytics, data storage, and networking (collectively, the "Cloud Services"). Each of the Cloud Services has its own fee and payment structure based on the applicable product purchased, but most are purchased on a consumption-based model. We agreed to minimum spend commitments as well as to reference AWS as Rivian Automotive, LLC's "preferred cloud provider" in return for certain service discounts.[72]

172.   Krawiec, as a director of Rivian, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

173.   Krawiec is neither disinterested nor independent.  Any demand upon Defendant Krawiec is futile and, thus, excused.

**F.      Demand Upon Defendant Flatley Is Excused**

174.   Flatley will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Flatley holds 72,616 shares of Rivian Class A common shares.  Flatley received $731,187 in compensation in the form of fees and stock and option awards for his service as a director in 2021.  If Flatley acknowledged that he, Rivian, or others engaged in misconduct, his investment in Rivian would be substantially devalued and his lucrative position jeopardized.

---

[72]      IPO Prospectus, p. 184.

175.    Defendant Flatley is named as a defendant in the pending securities class actions. As such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

176.    Flatley authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

177.    Flatley is the CEO and Chair of the Board of Zymergen, a biotechnology company. J.P. Morgan Securities LLC ("J.P. Morgan"), Goldman Sachs & Co. LLC ("Goldman Sachs"), and BofA Securities, Inc ("BofA Securities"). the underwriters for Rivian's IPO, also acted as underwriters for Zymergen's initial public offering on April 22, 2021.  J.P. Morgan, Goldman Sachs, and BofA Securities are named defendants in the securities class actions and Flatley would not take any action to jeopardize their defense therein.

178.    Flatley, as a director of Rivian, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate, and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

179.    As a member of the Audit Committee, Flatley had duties regarding oversight of the risks facing the Company and Rivian's compliance with relevant laws, rules, and regulations. Flatley utterly failed to perform these essential duties.

180.    Flatley failed to uphold his additional obligations as a member of the Nominating and Governance Committee, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

181.    Flatley is neither disinterested nor independent.  Any demand upon Defendant Flatley is futile and, thus, excused.

**G.    Demand Upon Defendant Thomas-Graham Is Excused**

182.    Defendant Thomas-Graham will not investigate and take action against those responsible for the wrongdoing pled herein because doing so would harm her and her investments. Thomas-Graham holds 20,713 shares of Rivian Class A common shares. Thomas-Graham received $995,296 in compensation in the form of fees and stock and option awards for her service as a director in 2021.  If Thomas-Graham acknowledged that she, Rivian, or others engaged in misconduct, her investment in Rivian would be substantially devalued and her lucrative position jeopardized.

183.    Defendant Thomas-Graham is named as a defendant in the pending securities class actions.  As such, she is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

184.    Thomas-Graham authorized the 2022 Proxy Statement containing false and misleading statements and material omissions and faces a substantial likelihood of liability therefor.

185.    Thomas-Graham has a long-standing business relationship with Defendant Boone which precludes them from acting in an independent and disinterested manner.  Thomas-Graham has been a director on the board of Peloton alongside Defendant Boone for more than three years.

186. Thomas-Graham, as a director of Rivian, was required to, but failed to: (1) implement and maintain an effective system of internal controls to ensure that the Company was complying with all laws, rules, and regulations governing Rivian's core operations and making truthful, accurate and complete statements to investors and customers; (2) effectively oversee the material risks facing the Company; and (3) investigate and take action when presented with red flags regarding misconduct in connection with the Company's pricing strategy, production capabilities, representations to investors and customers, and the Company's corporate culture.

187. As a member of the Audit Committee, Thomas-Graham had duties regarding oversight of the risks facing the Company and Rivian's compliance with relevant laws, rules, and regulations. Thomas-Graham utterly failed to perform these essential duties.

188. Thomas-Graham failed to uphold her additional obligations as Chair of the Nominating and Governance Committee, which include, inter alia, ensuring the implementation and effectiveness of the Code of Conduct and Corporate Governance Guidelines.

189. Thomas-Graham is neither disinterested nor independent. Any demand upon Defendant Thomas-Graham is futile and, thus, excused.

### H.   Other Factors Demonstrating That Demand Upon The Individual Defendants Is Excused

190. Rivian has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

191. The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve

their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

192.    Publicly traded companies, such as Rivian, typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose a recovery from the insurers if the Individual Defendants sue each other to recover Rivian's damages.

## VII.    CLAIMS FOR RELIEF

<u>**COUNT ONE**</u>
**Against the Individual Defendants for**
**Violations of Section 14(a) of the Exchange Act**

193.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

194.    The Section 14(a) claim alleged herein is based solely on negligence. It is not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claim alleged herein does not allege and does not sound in fraud.  Plaintiff specifically disclaims any allegations of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to those non-fraud claims.

195.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

196.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

197.    The 2022 Proxy Statement was materially false and misleading because the Individual Defendants failed to maintain adequate internal controls and conduct the required oversight, over Rivan's pricing strategy, production capabilities, and corporate culture. The Individual Defendants also failed to implement and maintain an effective system of internal controls to ensure the timely disclosure of truthful, accurate and complete information as required by the securities laws, which has resulted in the Company being named a defendant in the securities fraud class action lawsuits.

198.    The misleading information contained in the 2022 Proxy Statement was material to Rivian's shareholders in determining whether to elect Scaringe, Krawiec, and Schwartz to the Board.

199.    The material misstatements and omissions in the 2022 Proxy Statement damaged the Company.

200.    Plaintiff, on behalf of Rivian, seeks relief for damages inflicted upon the Company based on the misleading 2022 Proxy Statement in connection with the improper election of certain members of the Board.

## COUNT TWO
### Against the Individual Defendants
### for Breach of Fiduciary Duties

201.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

202.    The Individual Defendants owed and owe fiduciary duties to Rivian.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe Rivian the highest obligation of good faith and loyalty in the administration of Rivian's affairs, including assuring that Rivian complied with state and federal laws governing, among other things, the making of truthful, complete and accurate public statements regarding the Company's financial condition and business prospects and workplace discrimination and retaliation against employees who alleged discrimination.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to Rivian alleged herein.

203.    The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

204.    The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of Rivian in a manner consistent with the duties imposed upon them by law.

205.    By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of Rivian's affairs and in the use and preservation of Rivian's assets.

206.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Rivian has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages include, among other things, the costs of defending and resolving the pending securities class action lawsuits and the gender discrimination lawsuit.

207.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**COUNT THREE**
**Against the Individual Defendants**
**for Contribution and Indemnification**

208.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

209.    The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

210.    The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions.  Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

## COUNT FOUR
### Against the Individual Defendants
### for Aiding and Abetting

211.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

212.    Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

213.    In committing the wrongful acts, each of the Individual Defendants has pursued or joined in the pursuit of a common course of conduct.  They have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

214.    Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

215.    Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

## COUNT FIVE
### Against the Individual Defendants
### for Gross Mismanagement

216.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

217.    The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

218.   The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned, and abdicated their responsibilities and duties regarding prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

219.   During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Declaring that Plaintiff may maintain this action on behalf of Rivian and that Plaintiff is an adequate representative of the Company;

(b)   Declaring that the Individual Defendants violated Section 14(a) of the Exchange Act;

(c)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Rivian;

(d)   Declaring that the Individual Defendants have grossly mismanaged Rivian;

(e)   Directing the Company to take all necessary actions to reform and improve its internal controls and Board oversight concerning gender discrimination and pay disparity;

(f)   Determining and awarding to Rivian the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(g)     Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties;

(h)     Awarding Rivian restitution from the Individual Defendants, and each of them;

(i)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(j)     Granting such other and further relief as the Court may deem just and proper.

## IX.     JURY DEMAND

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

Dated: May 5, 2022

OF COUNSEL

David C. Katz
Leigh Smith
Joshua M. Rubin
**WEISS LAW**
305 Broadway, 7th Floor
New York, NY 10007
Telephone: (212) 682-3025
Facsimile: (212) 682-3010
Email: dkatz@weisslawllp.com
    leigh.smith@weisslawllp.com
    jrubin@weisslawllp.com

*Plaintiff's Counsel*

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange St., Suite 1120
Wilmington, DE  19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorneys for Plaintiff*